**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**DERRICK WOODBERRY (#355771)** **CIVIL ACTION**

**VERSUS** **NO. 25-883-SDD-SDJ**

**WALTER JARRELL, ET AL.**

**NOTICE**

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have **14 days** after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law, and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within **14 days** after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on August 26, 2026.

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**DERRICK WOODBERRY (#355771)** **CIVIL ACTION**

**VERSUS** **NO. 25-883-SDD-SDJ**

**WALTER JARRELL, ET AL.**

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

The *pro se* Plaintiff, an inmate confined at the Louisiana State Penitentiary, Angola, Louisiana, filed this proceeding pursuant to 42 U.S.C. § 1983 against numerous defendants, complaining that his constitutional rights were violated in a multitude of ways, but primarily due to retaliation. He seeks monetary, injunctive, and declaratory relief.

**28 U.S.C. §§ 1915(e) and 1915A**

Pursuant to 28 U.S.C. §§ 1915(e) and 1915A, this Court is authorized to dismiss an action or claim brought by a prisoner who is proceeding *in forma pauperis* or is asserting a claim against a governmental entity or an officer or employee of a governmental entity if satisfied that the action or claim is frivolous, malicious, or fails to state a claim upon which relief may be granted. An action or claim is properly dismissed as frivolous if the claim lacks an arguable basis either in fact or in law. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992), *citing Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Hicks v. Garner*, 69 F.3d 22, 24-25 (5th Cir. 1995). A claim is factually frivolous if the alleged facts are "clearly baseless, a category encompassing allegations that are 'fanciful,' 'fantastic,' and 'delusional.'" *Id*. at 32-33. A claim has no arguable basis in law if it is based upon an indisputably meritless legal theory, "such as if the complaint alleges the violation of a legal interest which clearly does not exist." *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998). The law accords judges not only the authority to dismiss a claim which is based on an indisputably

meritless legal theory, but also the unusual power to pierce the veil of the factual allegations. *Denton v. Hernandez*, *supra*, 504 U.S. at 32. Pleaded facts which are merely improbable or strange, however, are not frivolous for purposes of § 1915. *Id*. at 33; *Ancar v. Sara Plasma, Inc.*, 964 F.2d 465, 468 (5th Cir. 1992). A § 1915 dismissal may be made any time, before or after service of process and before or after an answer is filed, if the court determines that the allegation of poverty is untrue; or the action is frivolous or malicious; fails to state a claim on which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2) and *Green v. McKaskle*, 788 F.2d 1116, 1119 (5th Cir. 1986).

**Plaintiff's Allegations**

In his Complaint, as amended, Plaintiff Woodberry alleges the following: In 2019, Woodberry was attacked in his sleep at Angola by inmate Kendall Davis, which led to Woodberry's transfer to Elayn Hunt Correctional Center. In July 2022, he was moved to David Wade Correctional Center near documented enemies, but later in 2022 a sealed federal order concerning his safety resulted in his transfer back to EHCC. In December 2022, he filed a federal civil rights lawsuit (22-cv-00979) against several EHCC officials for retaliation and cruel and unusual punishment. In February 2024, several of the defendants also named in the instant matter were dismissed from Plaintiff's earlier suit (22-cv-00979).

In March 2024, Woodberry emailed Assistant Warden Walter Jarrell, warning that inmate Allen Dabney posed a danger to him and another prisoner, Ledbetter. The same day Dabney pulled a homemade shank on Ledbetter and threatened him to stay away from Woodberry. No disciplinary action was taken against Dabney. In April 2024, after attorney Donna Grodner requested video preservation of the incident, Woodberry filed an ARP about Jarrell's failure to act. That same day, he was placed in involuntary protective custody, and a hearing officer told him he was locked up

"because you filed this ARP." Dabney was placed in lockdown, but Ledbetter was not. Ledbetter was told by Assistant Warden Craig White that he was being transferred for angering the wrong official (Jarrell). On May 6, 2024, after a protection hearing, Woodberry was moved into a unit near enemies, and when Donald Johnson called Jarrell about housing him near enemies, Jarrell responded that Woodberry would "have to deal with it." On May 8, 2024, former Secretary James LeBlanc met with Woodberry and learned of Woodberry's placement near enemies, the warning about Dabney, and Jarrell's failure to act. He became angry and ordered Donnie Bordelon to correct the situation. On May 10, 2024, Woodberry was moved back to Unit 1. On May 13, 2024, Russ and Jarrell were demoted. On May 29, 2024, two of Plaintiff's enemies were transferred to other prisons.

In June-July 2024, Ledbetter, who had been transferred to Rayburn Correctional Center, was transferred back to EHCC due to a deal Bordelon made with Woodberry. Meanwhile WBRZ was reporting on corruption at Hunt. Jarrell was moved to Unit 1 as an interim warden and was upset that Ledbetter was back at EHCC and that Plaintiff had exposed his failures about the Dabney incident.

On August 16, 2024, Ledbetter and Woodberry were searched per the orders of Brandy Landry, Jason Russ, and Jarrell in order to find the phone or device that Woodberry was using to access e-mails. On August 29, 2024, there was a shakedown of the unit and Jarrell personally searched Plaintiff's housing area and ransacked his legal documents. Jarrell was still looking for the device being used by Woodberry. Following the shakedown, Ledbetter was moved to investigative segregation, and Woodberry was summoned to Jarrell's office. Jarrell asked, "when are you gonna stop filing on us?" and stated, "Don't worry, Ledbetter's not coming back." Plaintiff

was then strip searched by Warren Dugas, per the order of Jarrell. Dugas told Woodberry that Jarrell thought he had drugs and that maybe he should stop and leave people alone.

Woodberry then spoke to Bordelon about a disciplinary report against Ledbetter and explained that the charge was part of Landry, Jarrell, and Russ' harassment of Plaintiff due to the Dabney incident and his refusal to drop his lawsuit. Bordelon assured Woodberry that he would look into it. Around the same time, Woodberry received information revealing extensive corruption at EHCC and that he was being targeted through Ledbetter due to his alliance with Bordelon and his knowledge of institutional corruption.

On September 20, 2024, attorney Kellen Mathews requested preservation of the August shakedown video to prove that the disciplinary charge against Ledbetter was false. On September 23, 2024, Borden ordered that Ledbetter be released, which made Landry, Jarrell, and Stephanie Gaines visibly upset. On September 26, 2024, Bordelon approached Woodberry and stated, "you know what the video shows, you ain't stupid." The same day, Bordelon was suspended from his position as Head Warden. Woodberry and Ledbetter were cuffed on orders of Major Jason Linzy and Landry and charged with sexual misconduct (Rule 21C). As they passed Jarrell he shouted, "I told you he wasn't coming back. You ain't listen!" Woodberry was then placed in an observation cell that was covered with human feces, contaminated with chemical agent residue, and had nonfunctioning water and a leaking toilet. Woodberry was also not given toilet paper or bedding and developed a severe rash.

On September 27, 2024, Woodberry's family emailed Secretary Gary Westcott and Chief of Operations Seth Smith about retaliation, Bordelon's suspension, and Woodberry's being targeted for Bordelon's removal. Secretary Westcott immediately replied, and Smith promised to investigate. However, Denyshia Williams refused to accept Woodberry's retaliation ARP and

destroyed it. Woodberry and his family sent more emails to Westcott and Smith. Ledbetter was then interviewed by Linzy and Landry, who attempted to persuade Ledbetter to say that he and Woodberry were having sex. Woodberry was not interviewed.

On October 8, 2024, Jarrell visited Woodberry on the order of Smith to follow up on the Woodberry's family's allegations. Instead, Jarrell intimidated Plaintiff by saying, "drop the damn request for a copy of the video or you're going to end up in lockdown" and "you'll have worse problems to worry about than this write up." Landry held mail pertaining to Woodberry's other case (22-00979) for 40 days. She offered to drop the Rule 21C charge and let him out if he dropped the lawsuit and the video request.

On October 14, 2024, Internal Affairs investigator Lt. Col. Kleinpeter and Deputy Warden Luke Rheams interviewed Woodberry purportedly about Bordelon's suspension and the Rule 21C charge, but after first meeting with Landry, they instead concentrated on discovering how Woodberry was communicating with Bordelon and the outside world and covering up the false disciplinary charge. Due to the investigation, Ledbetter was documented as an enemy of Woodberry, which was the first step in enforcing the "Woodberry Rule."

Woodberry was moved to punitive segregation on October 18, 2024, though he had not yet been found guilty. Despite acknowledging that Woodberry did not belong in punitive segregation, Donald Johnson continued to enforce the segregation. Meanwhile, other inmates who received Rule 21C violations were allowed to continue being housed together. On October 28, 2024, Major Stephanie Gaines conducted a disciplinary hearing, read Landry's false report into the record, denied Woodberry's motions, and sentenced him 30 days segregation. Russ tried to bribe Woodberry by promising to sign off on the cellblock review board and transfer an enemy if he dropped his lawsuit and stopped filing ARPs. Woodberry filed appeals for himself and Ledbetter.

A cellblock review board recommended, on October 21, 2024, that Woodberry and Ledbetter be released from segregation, but they were kept in segregation by Willie Verrett and Gaines per the orders of Landry, Russ, Rheams, and Edward Bickham. Numerous emails were exchanged about the housing situation by Russ, Stephen Coody, and Donald Johnson. Johnson did not release Woodberry and Ledbetter from segregation. When Verrett was asked why they had not been moved to general population, Verrett said, “tell Ledbetter and Woodberry to get comfortable, I’m not releasing them.” On November 15, 2024, Luke Rheams told Woodberry that his release was probably rescinded. Stephen Coody told Woodberry, “listen you and Ledbetter are a hot topic, y’all are caught up with this thing with Bordelon. Donald Johnson then told Woodberry that “they” were trying to transfer him and Ledbetter.

On December 4, 2024, Warden Tim Hooper and Deputy Warden Chad Darbonne met with Jarrell and created an unwritten exclusionary rule that separated Woodberry and Ledbetter (the “Woodberry Rule”). Jarrell desired that they be separated permanently. Hooper and Darbonne called Woodberry to the investigative services office, and Hooper told Woodberry, “I’m back, tell your people to stop going to Headquarters. How much time do you have? Do you want to spend the rest of your life in a cell at Angola? Well chill out, I’m not sending you back to Unit 1 with Jarrell, everybody here at Hunt hates you, they say you are filing on all of them.” After 73 days in segregation, Woodberry was released to Unit 2 on December 5, 2024. Ledbetter was released to Unit 1, and Jarrell made jokes to Ledbetter about Woodberry not returning with him.

On December 8, 2024, Woodberry discovered that several personal items and legal materials were missing from his property. Despite Woodberry’s letting Darbonne know, his property was never returned. Hooper again threatened Woodberry with transfer to Angola on December 16, 2024. Woodberry explained that he has several enemies at Angola, and Hooper

replied, "stop complaining, I let you out and you're filing shit already. I saw your appeal, you were done wrong, the paperwork wasn't done right." Two days later, on December 18, 2024, Hooper granted Woodberry's disciplinary appeal and exonerated him of the Rule 21C charge. Despite this, Woodberry and Ledbetter were still kept apart.

On December 26, 2024, Warren Dugas called Woodberry to his office and pressured him to drop an ARP. Woodberry refused and asked about returning to Unit 1. Dugas told him "them people don't want you on Unit 1, you can't be around Ledbetter." Woodberry attempted to enroll in HVACR School but was informed by Kolby Johnson that he would have to check into it since Woodberry was not allowed to be near Ledbetter.

On January 21, 2025, Woodberry was escorted outside in 14-degree weather by Dugas to speak to Craig White on the phone. White requested that Plaintiff withdraw his ARP against Dugas. This ARP has been held for 70 plus days by Denyshia Williams in order to assist Dugas, Russ, Jarrell, and Landry in their efforts to force Woodberry to withdraw the ARP. Woodberry agreed to withdraw the ARP. A few days later White told Woodberry that he couldn't move him back to Unit 1 because Hooper had a thing with Jarrell to keep him and Ledbetter separated. Around February 4, 2025, White told Woodberry that lawyers had been calling about his lawsuit and then attempted to coerce Plaintiff to drop his lost property claim. Plaintiff refused and asked White why he was being denied access to Unit 1 for Rastafarian study on Saturdays. White replied, "you can't go on Unit 1, you can't be around Ledbetter, you know that already. Don't worry I'm stopping all the Rastafarian callouts on my units soon anyway."

On February 24, 2025, Darbonne offered to pay for a clothing package for Woodberry if he withdrew his lost property complaint. Woodberry refused. On March 6, 2025, Hooper again threatened to transfer Woodberry to Angola. Woodberry's family emailed Westcott and Smith

about the dangers of transferring Woodberry to Angola. On March 10, 2025, Hooper told Woodberry that his threats were just entertainment and that he wasn't really going to transfer him. Woodberry was interviewed by Terry Braun and Kimberly Williams. The interview focused on who was communicating with headquarters. On March 26, 2025, Smith replied to the family's email noting that the department has responded to numerous complaints in writing and by phone, but that Woodberry's family continued to bombard the department with threatening correspondence. Smith attached a report that Woodberry believes was written by Braun and Williams. The report stated that Woodberry and Ledbetter were being housed separately due to the nature of their relationship. The report also showed that Plaintiff had numerous enemies and that some of his documented enemies had been removed. Woodberry's family had threatened to disclose emails to the media and were copying a reporter, Bess Casserleigh, on emails along with DPSC officials.

Around May 16–17, 2025, inmate Nelson Tippen, assisted by Donald Johnson, reported White's alleged contraband-trafficking scheme directly to Warden Keithe Turner, asserting that White was underreporting seizures of drugs, phones, liquor, and cigarettes, redistributing contraband to coerced inmate sellers, and taking profits through Cash App and Chime accounts. Instead of investigating Tipper's claims, Turner transferred Tippen. On May 22, 2025, WBRZ broadcasted leaked UORs documenting excessive force, drug use, and assaults on staff and inmates at EHCC. Days later Donald Johnson was placed on suspension and Darbonne, Russ, and Turner accused Woodberry of leaking the documents because Woodberry had access to Johnson's office and based on inmate and staff statements. Statements were given in exchange for favorable treatment.

In late May, Woodberry's family sent detailed complaints to Louisiana Community and Technical College System about issues with the HVACR program. The complaints were also sent to college employees. As a result, Kolby Johnson withheld Woodberry's module examinations, and Joe Buttross would not provide Woodberry's classification folder to Carlene Vidrine.

In early June 2025, Major Gavin Travis interviewed Woodberry about the UOR leak. Warden Turner arrived during the interview, and he and Travis threatened Woodberry with transfer. On June 4, 2025, a conspiracy began to remove documented enemies from Woodberry's records. Westcott, Buttross, Jarrell, Smith, Russ, Landry, Gaines, Verrett, White, Turner, Coody, Rheams, and Vidrine were all involved in expediting Woodberry's transfer despite known safety concerns. On June 5, 2025, Woodberry spoke to Coody about the exclusionary rule and Coody replied that the rule was based on personal bias.

On June 13, 2025, Woodberry was informed that Ledbetter was being transferred to RLCC. Coody told Woodberry, "they are going to physically make sure y'all are separated." Later that day Woodberry sent an email to Coody about Craig White's corrupt activities. Reporter Bess Casserleigh was copied along with attorney Kellen Matthews. Three days later Woodberry was transferred to Angola. While Woodberry was being processed for transfer, mental health worker Grace Wilburn told Woodberry, "I documented everything you told me. Are they transferring you? I am so sorry." Woodberry also saw Joe Buttross and asked him why he was being transferred to Angola when he has so many enemies there. Buttross responded, "I know, write me a letter." Minutes later Warden Turner walked by and smiled at Woodberry. Woodberry asked why he was being transferred despite his enemies and Turner replied, "You leaked them UORs huh, White called me Friday and said you sent an email for Ledbetter…you will see I do my own thing I don't play."

Upon arrival at Angola, Woodberry was informed that several of his documented enemies had been removed from his records. Woodberry was moved to Camp D and was immediately threatened by a known enemy. On June 26, 2025, a story about Woodberry was aired by Bess Casserleigh. The same day Woodberry's cell was searched by Donnie Bordelon, Shannon Demars, and others. Woodberry was asked how he was communicating with the media. Woodberry's personal property and legal work were confiscated.

On July 22, 2025, Woodberry received an inadequate response to his ARP regarding manipulation of his enemy list. Woodberry had filed the ARP months earlier, but Denyshia Williams did not process it until Woodberry had been transferred. Woodberry's personal property was collected per the orders of Shannon Demars, and it was supposed to be mailed to his home. Instead, his property was destroyed. Woodberry's ARP and lost property claim remained unanswered despite his emailing Westcott and Williams multiple times. After Plaintiff sent these emails, Bordelon and Demars ordered repeated shakedowns of Woodberry's cell. On September 23, 2025, Woodberry attempted to speak to Demars about his enemy list and Demars said, "If you cause me anymore trouble I'mma lock you back down." Woodberry's ARP was finally denied on September 30, 2025.

On October 10, 2025, Carlene Vidrine spoke to Woodberry and admitted that there was a multi-layered conspiracy to transfer Woodberry. False disciplinary records were used as a pretext for the transfer. The transfer was ordered by Secretary Westcott who asked Vidrine, "what must be done to effectuate the transfer despite the enemies."

**Louisiana Department of Public Safety and Corrections**

First, pursuant to 42 U.S.C. § 1983, only a "person" may be sued for the violation of an inmate's constitutional rights. Defendant Louisiana Department of Public Safety and Corrections

is not a person within the meaning of § 1983. *Washington v. Louisiana*, 425 F. App'x 330, 333 (5th Cir. 2011). The Department is also entitled to sovereign immunity with regards to Plaintiff's § 1983 claims. "[T]he Fifth Circuit has squarely held that the Louisiana Department of Public Safety and Corrections is an arm of the State that is entitled to Eleventh Amendment immunity." *Beyard v. Caddo Parish Com'n*, 2007 WL 1741970, at * 2 (W.D. La. April 27, 2007) (*citing Champagne v. Jefferson Parish Sheriff's Office*, 188 F.3d 312, 314 (5th Cir. 1999)). As such, Plaintiff's section 1983 claims asserted against defendant Louisiana Department of Public Safety and Corrections should be dismissed.

**Official Capacity Claims**

***Monetary Damages***

As to any claims Plaintiff may be asserting against individual Defendants in their official capacities, section 1983 does not provide a federal forum for a litigant who seeks the recovery of monetary damages against state officials acting in their official capacities, specifically because these officials are not seen to be "persons" within the meaning of § 1983. *Will v. Michigan Department of State Police*, 491 U.S. 58, 64 (1989). Additionally, in *Hafer v. Melo*, 502 U.S. 21 (1991), the United States Supreme Court addressed the distinction between official capacity and individual capacity lawsuits and made clear that a suit against a state official in his official capacity for monetary damages is treated as a suit against the state and is therefore barred by the Eleventh Amendment. *Id*. at 25. Accordingly, Plaintiff's claims for monetary damages asserted against Defendants in their official capacities are subject to dismissal. In contrast, Plaintiff's claims for monetary damages asserted against Defendants in their individual capacities remain viable because a claim against a state official in his individual capacity, seeking to impose liability for actions taken by the official under color of state law, is not treated as a suit against the state. Of course, Plaintiff must prove a deprivation of a constitutional right to obtain any relief.

**Individual Capacity Claims**

***Administrative Proceedings/Informal Complaints***

With regards to Defendant Denyshia Williams, Plaintiff complains of the mishandling of his grievances and/or informal complaints. An inmate does not have a constitutional right to have his prison disciplinary or administrative proceedings properly investigated, handled, or favorably resolved. *Mahogany v. Miller,* 252 F. App'x. 593, 595 (5th Cir. 2007), and there is no procedural due process right inherent in such a claim. As stated by the United States Court of Appeal for the Fifth Circuit in *Geiger v. Jowers,* 404 F.3d 371 (5th Cir. 2005) (in the context of the handling of an administrative grievance):

> Insofar as [the plaintiff] seeks relief regarding an alleged violation of his due process rights resulting from the prison grievance procedures, the district court did not err in dismissing his claim as frivolous…[The plaintiff] does not have a federally protected liberty interest in having these grievances resolved to his satisfaction. As he relies on legally nonexistent interest, any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless. *Id*. at 373-74.

***Verbal Abuse***

With regards to the alleged harassment by Defendants Walter Jarrell, Jason Russ, Joe Buttross, Brandy Landry, Tim Hooper, Chad Darbonne, Warren Dugas, Kimberly Williams, Stephen Coody, Keithe Turner, Gavin Travis, Luke Rheams, Craig White, Shannon Demars, allegations of mere verbal abuse, in the form of threats, insults, or harassment, even if true, do not amount to a constitutional violation. *Orange v. Ellis,* 348 Fed. Appx. 69, 72 (5th Cir.2009); *McFadden v. Lucas,* 713 F.2d 143, 146 (5th Cir.1983).

***Deprivation of Property***

Plaintiff alleges that his legal work was confiscated or destroyed by Defendants Shannon Demars, Donnie Bordelon, and Walter Jarrell. Whether intentional or negligent, the "random and unauthorized" deprivation of property neither violates the Constitution nor states a claim under 42

U.S.C. § 1983 when adequate state post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Louisiana law provides Plaintiff the opportunity to seek redress for either the alleged negligence or intentional torts committed by these public officials. *See* Louisiana Civil Code Article 2315. This provision of state law, which is the general tort provision of Louisiana's Civil Code, provides all the process that is required, and thus, the Fourteenth Amendment is not implicated. *Charbonnet v. Lee,* 951 F.2d 638 (5th Cir. 1992). Because Plaintiff has available post-deprivation remedies through the state courts, his claim based on the alleged taking of his personal property, fails to state a claim under *Hudson.*

***Access to the Courts***

Plaintiff complains of interference with his right of access to the courts by Defendant Denyshia Williams (due to the delay in processing his grievances), Defendants Marcus Jones, Shannon Demars, Walter Jarrell and Donnie Bordelon (due to the confiscation and/or destruction of his property), and Defendant Brandy Landry (due to a delay in processing Plaintiff's legal mail). A substantive right of access to the courts has long been recognized. *Lewis v. Casey,* 518 U.S. 343, 347 (1996), *citing Bounds v. Smith,* 430 U.S. 817, 821 (1977). Specifically, access to the courts is incorporated into the First Amendment right to petition the government for redress of grievances. *Driggers v. Cruz,* 740 F.3d 333, 336–37 (5th Cir. 2014) citing *Bill Johnson's Rests., Inc. v. N.L.R.B.,* 461 U.S. 731 (1983). In its most obvious and fundamental manifestation, this right protects an inmate's physical access to the courts. Thus, for example, prison officials may not block or refuse to transmit, through procedural devices or otherwise, the transmission of legal documents that prisoners wish to send to the courts. *Ex parte Hull,* 312 U.S. 546 (1941) (striking down a state regulation prohibiting prisoners from filing petitions for habeas corpus without the approval of a state official); *Jackson v. Procunier,* 789 F.2d 307, 310–11 (5th Cir. 1986) (prison officials may

not deliberately delay mailing legal papers when they know that such delay will effectively deny a prisoner access to the courts). Nor can they take other actions—such as confiscating or destroying legal papers—that would have a similar effect. *See Foster v. City of Lake Jackson,* 28 F.3d 425, 429 (5th Cir. 1994), *citing Crowder v. Sinyard,* 884 F.2d 804, 811 (5th Cir.1 989).

In order to prevail on a claim of interference with access to the courts, an inmate claimant must be able to show that has he suffered some cognizable legal prejudice or detriment as a result of the defendant's actions. *Eason v. Thaler,* 73 F.3d 1322, 1328 (5th Cir. 1996). In addition, the plaintiff must be able to show that the defendant had an intent to interfere with the plaintiff's right to submit pleadings to the courts or was otherwise deliberately indifferent to the plaintiff's wish to do so. *See Herrington v. Martin,* 2009 WL 5178340, *2 (W.D. La., Dec. 23, 2009) (recognizing that "[a]n 'access to courts' claim is actionable only if the deprivation stemmed from intentional conduct on the part of the defendant; 'access to courts' claims premised on a defendant's mere negligence or inadvertence are not cognizable under § 1983'').

Finally, an inmate's right to seek access to the courts is limited to the making of non-frivolous claims involving the assertion of legitimate constitutional rights. *Johnson v. Rodriguez,* 110 F.3d 299, 311 (5th Cir. 1997). Therefore, because the right to access to the courts "rest[s] on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court," *Christopher v. Harbury,* 536 U.S. 403, 415 (2002), "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint." *Id.*

In the present matter, the Complaint fails to state a claim for denial of access to the courts. Plaintiff has not described any particular cause of action and has not alleged to have suffered any legal prejudice or detriment as a result of any of Defendants' actions. As such, Plaintiff fails to

state a claim for denial of access to Courts due the mishandling of his grievances, the confiscation of his legal work, and the delay in processing his mail.

***Failure to Protect***

Plaintiff alleges that Defendants Walter Jarrell, Jason Russ, Gary Walcott, Andrea Buttross, Carlene Vidrine, Keithe Turner, Shannon Demars, Donald Johnson, and Stephanie Michel failed to protect him from harm due to internal or external transfers near known enemies and/or manipulation of his enemies list to transfer plaintiff near his known enemies. Under the Eighth Amendment to the United States Constitution, a prisoner has a constitutional right to be sheltered from the threat of harm or violence at the hands of other inmates. *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986); *Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981). Specifically, prison officials "have a duty ... to protect prisoners from violence at the hands of other inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

"Deliberate indifference" is the appropriate standard to be applied in this context, and this term has been defined as including an element of "subjective recklessness" as used in the criminal law. *Id.* at 837. A prison official may be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety only if he knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Id. at 847*. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Id.* at 837.

In the instant matter, Plaintiff does not allege that he suffered any harm; therefore, he has not sufficiently alleged a failure to protect claim. *Wolters v. Federal Bureau of Prisons*, 352 F. App'x. 926, 927-28 (5th Cir. 2009) ("Wolters cannot prevail on his failure-to-protect claim

because he does not allege that he suffered an actual physical injury resulting from prison officials' purported failure to protect.")[1]. As such, Plaintiff fails to state a claim for failure to protect.

***Classification and Place of Incarceration***

To the extent Plaintiff complains of his classification and/or place of incarceration, these are not claims that this Court can resolve. Federal courts should not, under the guise of enforcing constitutional standards, assume the superintendence of state prison administration. *See Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir.1981) (en banc) (overruled on other grounds). Thus, this Court accords state prison administrators wide-ranging deference to adopt and to execute policies and practices that are needed to maintain and preserve order, discipline and security in prison. *See Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The classification of prisoners is such a practice that is left to the discretion of prison officials. *See McCord v. Maggio,* 910 F.2d 1248, 1250 (5th Cir.1990). "It is well settled that '[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status'." *McCord,* 910 F.2d at 1250 (quoting *Wilkerson v. Maggio,* 703 F.2d 909 (5th Cir.1983)).

In Louisiana, the classification of prisoners is the duty of the Department of Corrections and an inmate, such as Plaintiff, has no right to a particular classification. In addition, "speculative, collateral consequences of prison administrative decisions do not create constitutionally protected liberty interests." *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995) (citing *Meachum v. Fano,* 427 U.S. 215, 299 n. 8 (1976)).

---

[1] *See also*, *Walzier v. McMullen*, 333 F. App'x 848, 851 (5th Cir. 2009) (per curiam) (no failure to protect claim absent a showing of harm); *Caldwell v. Dallas County*, 71 F. App'x 354, 355 (5th Cir. 2003) (per curiam) (affirming summary judgment on failure to protect claim where "the evidence demonstrated that [the plaintiff] did not suffer an injury that was more than *de minimis*."); *Castellano v. Treon*, 79 F. App'x 6, 7 (5th Cir. 2003) ([inmate's] failure-to-protect claim fails because "he concedes that he suffered no actual physical injury resulting from the prison officials' purported failure to protect"). *Grant v. Collins*, 30 F.3d 1493 (5th Cir. 1994) (affirming dismissal of failure to protect claim where plaintiff "did not allege he suffered any harm from this incident.")

The United States Supreme Court has held that it is for state prison authorities to decide where a state prisoner is to be incarcerated, and that a prisoner has no right to challenge his place of incarceration. *See Olim v. Wakinekona,* 461 U.S. 238 (1983); *Meachum v. Fano,* 427 U.S. 215 (1976). Accordingly, Plaintiff's claims regarding his classification and place of incarceration fail to state a claim.

***Free Exercise of Religion***

Plaintiff alleges that Defendant Craig White denied Plaintiff access to Rastafarian study on Saturdays due to enforcement of the "Woodberry Rule." Plaintiff alleges that the Woodberry Rule was created by Defendants Walter Jarrell, Chad Darbonne, Tim Hooper, and Seth Smith to keep he and inmate Ledbetter from being housed in the same area based on a Rule 21(c) sex offense disciplinary conviction from which Plaintiff was fully exonerated. The Woodberry Rule was created in retaliation.

***RLUIPA***

The Religious Land Use and Institutionalized Persons Act of 2000, § 2 et seq., 42 U.S.C.A. § 2000cc et seq. prohibits imposing a substantial burden on an inmate's religious exercise unless that burden furthers a compelling interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a). RLUIPA provides a private cause of action for an inmate to enforce this right. 2 U.S.C. § 2000cc–2(a). It states, in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc–1(a).

"Congress enacted RLUIPA to address 'frivolous or arbitrary' barriers impeding [prisoners'] religious exercise...." *Davis v. Davis*, 826 F.3d 258, 264 (5th Cir. 2016) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 716 (2005)). RLUIPA's provisions are sweeping: "Congress enacted RLUIPA ... 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, 547 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S.682, 693 (2014)).

RLUIPA established a burden-shifting framework for analysis. *Ali v. Stephens*, 822 F.3d 776, 782 (5th Cir. 2016). First, the plaintiff must make two showings: "(1) the relevant religious exercise is 'grounded in a sincerely held religious belief' and (2) the government's action or policy 'substantially burden[s] that exercise' by, for example, forcing the plaintiff 'to engage in conduct that seriously violates [his or her] religious beliefs.' " *Id.* at 782–83 (quoting *Holt*, 547 U.S. 352, 361). Once the plaintiff satisfies these requirements, the burden shifts to the government, which must "show that its action or policy (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that interest." *Id.* at 783.

Plaintiff herein does not allege that Rastafarian study on Saturdays is grounded in a sincerely held religious belief. Nor does Plaintiff allege that Defendants' actions substantially burden the exercise of his religion. Plaintiff has not alleged that he is being forced to act in a way that violates his religious beliefs or that he has been forced between choosing between some non-trivial benefit and following his religious beliefs. *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). As such, Plaintiff has failed to state a claim under RLUIPA.

***Free Exercise Clause of the First Amendment***

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth Amendment, prohibits conduct which unreasonably impinges upon the free exercise of an inmate's religious beliefs. *Copeland v. Livingston,* 464 Fed. App'x. 326 (5th Cir. 2012). While

inmates retain their First Amendment religious rights notwithstanding their incarcerated status, the exercise of these rights is subject to reasonable restrictions and limitations necessitated by penological goals. *O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). *See also Baranowski v. Hart,* 486 F.3d 112 (5th Cir. 2007), *citing Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A prison action or regulation that impinges upon an inmate's First Amendment constitutional rights is valid if it is reasonably related to legitimate penological interests. *Turner v. Safely, supra.*

The First Amendment provides less protection than the RLUIPA. *Holt v. Hobbs*, 574 U.S. 352, 361-62 (2015). Because Plaintiff's related RLUIPA claim fails as discussed above, he is not entitled to relief under the less stringent First Amendment standard. *See Jones v. Shabazz*, 352 F. App'x. 910, 915 (5th Cir. 2009) (explaining that, because TDCJ's policies satisfied RLUIPA, the plaintiff could not make out a claim under the First Amendment).

***Conditions of Confinement***

Plaintiff complains that, due to the actions of Defendants Donnie Bordelon, Jason Linzy, Brandy Landry, and Walter Jarrell, he was, on September 26, 2024, placed in an observation tank in the D1 cellblock that was unsanitary. Plaintiff alleges that the cell was covered with human feces and chemical agent residue. He had no running water, the toilet leaked, and he had no toilet paper or bedding. It is unclear how long Plaintiff was housed in the observation cell, but at most it was 22 days since he was moved to disciplinary segregation on October 18, 2024.

This claim may be seen to arise under the Eighth Amendment to the United States Constitution and its prohibition against cruel and unusual punishment, which provision prohibits the unnecessary and wanton infliction of pain. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991), *citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The prohibition against cruel and unusual punishment,

however, mandates only that prisoners be afforded humane conditions of confinement and that they receive adequate food, shelter, clothing, and medical care. *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001). *See also Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (recognizing that "[t]he Constitution does not mandate comfortable prisons ... but neither does it permit inhumane ones").

A constitutional violation occurs only when two requirements are met. First, there is the objective requirement that the condition "must be so serious as to 'deprive prisoners of the minimal civilized measure of life's necessities,' as when it denies the prisoner some basic human need." *Harris v. Angelina County, Texas*, 31 F.3d 331, 334 (5th Cir. 1994), *citing Wilson v. Seiter, supra*, 501 U.S. at 304. Second, under a subjective standard, the Court must determine that the prison official responsible for the deprivation has been "deliberately indifferent to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Fifth Circuit and the Supreme Court have both found that the conditions complained of state a claim for unconstitutional conditions of confinement. *See for example*, *Barnes v. Givens*, 746 F. App'x 401 (5th Cir. 2018) and *Taylor v. Riojas*, 592 U.S. 7 (2020). As such, Plaintiff's Complaint states a claim in this regard.

***Retaliation***

Turning to Plaintiff's retaliation claim, it is prohibited for prison officials to take action against an inmate in retaliation for the inmate's exercise of his constitutional rights. *See Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995). The purpose of allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights. *Morris v Powell*, 449 F.3d 682, 686 (5th Cir. 2006). Claims of retaliation by prison inmates, however, are regarded with skepticism, lest the federal courts potentially embroil themselves in

every adverse action that occurs within a penal institution. *Woods v. Smith, supra*, 60 F.3d at 1166. Accordingly, to prevail on a claim of retaliation, a prisoner must establish (1) that he was exercising or attempting to exercise a specific constitutional right, (2) that the defendant intentionally retaliated against the prisoner for the exercise of that right, (3) that an adverse retaliatory action, greater than *de minimis*, was undertaken against the prisoner by the defendant, and (4) that there is causation, *i.e.*, that "but for" the retaliatory motive, the adverse action would not have occurred. *Morris v. Powell, supra*, 449 F.3d at 684. *See also Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003); *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999). An inmate must allege more than his mere personal belief that he is the victim of retaliation, *Johnson v. Rodriguez*, 110 F.3d 299 (5th Cir. 1997), and inasmuch as claims of retaliation are not favored, it is the plaintiff's burden to provide more than conclusory allegations of retaliation:

> To state a claim of retaliation an inmate must ... be prepared to establish that but for the retaliatory motive the complained of incident ... would not have occurred. This places a significant burden on the inmate.... The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.
>
> *Woods v. Smith, supra*, 60 F.3d. at 1166.

Plaintiff alleges that he was retaliated against in several ways: (1) a false disciplinary charge; (2) the "Woodberry rule," (3) transfer to Louisiana State Penitentiary; (4) shakedowns; (5) legal mail being held for 40 days; (6) delay in acceptance and processing of grievances; (7) denial of enrollment in a vocational program; (8) manipulation of his enemy record; (9) placement in disciplinary segregation for 73 days; and (10) destruction and/or confiscation of legal work and personal belongings. Many of these alleged actions are not adverse retaliatory actions that are greater than *de minimis.*

With regards to the Woodberry Rule and the transfer to Louisiana State Penitentiary, although a prisoner has no constitutionally protected interest in a particular facility or a specific work assignment, transfer to a more dangerous prison is an adverse act capable of deterring a person of ordinary firmness from further exercising his constitutional rights. *See Bibbs v. Early*, 541 F.3d 267, 271 (5th Cir. 2008) and *Morris v. Powell*, 449 F.3d 682, 687 (5th Cir. 2006). Here, Plaintiff has not alleged that he was moved to a more dangerous housing unit within EHCC as a result of the Woodberry Rule. Nor has Plaintiff alleged, other than in a conclusory fashion, that Angola is a more dangerous prison than EHCC. Plaintiff's main complaint with his transfer to Angola is that his enemy list was manipulated thereby putting him in danger. However, this Court has already found that Plaintiff's enemy list was not tampered with. *See Woodberry v. LeBlanc, et al.,* 22-cv-979 at Record Document 95. As such, the complained of Woodberry Rule and transfer to Louisiana State Penitentiary do not amount to more than *de minimis* acts.

Nor are Plaintiff's complaints about his mail, his grievances, and denial of enrollment in a vocational class. *See Jebril v. Joslin*, 2008 WL 2491658, at *3 (S.D. Tex. June 18, 2008) (finding that without more, repeatedly interfering with an inmate's mail "does not establish greater than *de minimis* retaliation."), *LeMatre v. Grindstaff,* 2022 WL 1510549, (W.D. N.C. May 12, 2022) (confiscating or mishandling mail *de minimis* acts), *Scott v. Haney*, 2012 WL 6569308 (M.D. La., November 9, 2012), Report adopted at 2012 WL 6569295 (M.D. La., December 17, 2012) (finding that the failure to timely respond to an administrative grievance was not anything other than *de minimis*), *Johnson–El v. Beck,* 2011 WL 1155679, at *4 (W.D.N.C. Mar.25, 2011) (transfer resulting in inability to complete computer class *de minimis*) *Kitchen v. McDonald*, 2024 WL 4483309 (E.D. Mich. Jul. 22, 2024 (delay in taking college classes *de minimis*).

Though one case from this circuit has found denial of participation in an educational class to be more than *de minimis*, in that case, the inmate plaintiff was taking a college course for which he had paid $1,200 for tuition. After complaining about a class policy, he was expelled from the class and prohibited from taking any other classes for a year. *See Lyle v. Garza,* 2006 WL 3499512 (S.D.Tex. Dec.5, 2006). Plaintiff herein alleges only that he could not complete the HVACR course, which is more akin to *Johnson-El v. Beck* since Plaintiff does not allege that he has lost out on any tuition money or that he is barred from taking any other classes. As such, his HVACR course claim is *de minimis*.

With regards to Plaintiff's complaints about his property, some claims regarding loss of property are more than *de minimus*. *See Leggett v. Comer*, 280 F. App'x 333, 336 (5th Cir. 2008) (alleged loss of $11,000 worth of property more than *de minimus*). *Murray v. Miller*, 2024 WL 6901585, at *7 (N.D. Tex. Oct. 2, 2024) (deprivation of a permitted religious item more than *de minimus*). Here, however, the losses alleged by Plaintiff (unspecified property and legal work) do not amount to a retaliatory action that is more than *de minimus*. *See Ali v. Jones*, 2007 WL 2141381 (S.D. Tex., July 19, 2007) (where a guard allegedly destroyed the prisoner's personal property including four books, ten magazines, vitamins, several pencil sharpeners, six ink pens, and a set of drawing pencils, court held that the prisoner could not show that the allegedly adverse act constituted more than a *de minimis* injury); *Scott v. Haney*, 2012 WL 6569308 (M.D. La., November 9, 2012), Report adopted at 2012 WL 6569295 (M.D. La., December 17, 2012) (prisoner alleged that some of his legal work was destroyed in retaliation for his having filed grievances; court held that "even if defendant Haney's conduct was in fact retaliatory, the Court finds that the defendant's conduct amounted to no more than a *de minimis* or inconsequential 'retaliatory adverse act.' ")

As to Plaintiff's remaining retaliation claims, Plaintiff's complaints of retaliatory searches lack the requisite causation element. Plaintiff alleges that after there was media coverage regarding corruption at EHCC in July 2024, shakedowns began in August 2024. One such shakedown is described by Plaintiff as a "massive search of Golf 1" which occurred over a two-hour period. Other searches were conducted again after more media coverage in 2025, which included a story about Plaintiff.

Even if Defendants suspected that Plaintiff was communicating with the press (which Plaintiff does not deny that he was), Plaintiff cannot show that but for a retaliatory motive the searches would not have occurred. If Plaintiff was suspected of communicating with the press, then he was also suspected of possessing a device capable of such communications, which would be contraband. As such, the searches were done, at least in part, to find contraband possessed by Plaintiff and others as some of the media coverage discussed contraband being circulated by certain employees. Accordingly, Plaintiff cannot show that but for a retaliatory motive the searches would not have occurred.

Finally, with regards to Plaintiff's remaining allegations of retaliation, a false disciplinary charge resulting in 73 days of segregation, Plaintiff's allegations are sufficient to state a claim for retaliation at this stage. This claim alleges more than a de minimis action and a chronology of events from which retaliation may be inferred[2]. *See Hart v. Hairston,* 343 F.3d 762, 764 (5th Cir. 2003) (finding that an extended loss of commissary privileges and a sanction in the form of a twenty-seven day cell restriction, like a transfer to administrative segregation, did not qualify as *de minimis*).

---

[2] See the Court's recounting of Plaintiff's allegations regarding the series of alleged events from March through December of 2024.

***Conspiracy***

"To prove a conspiracy under § 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation, and (2) that an actual deprivation occurred." *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)). Regarding the first element: "To establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act." *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982). "Mere conclusory allegations of conspiracy cannot, absent reference to material facts, survive a motion to dismiss." *Id.* (citing *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977)). "[M]ore than a blanket of accusation is necessary to support a § 1983 claim." *Id.* (citations omitted). Plaintiffs must make "specific allegation[s] of fact tending to show a prior agreement has been made." *See id.* at 1023–24.

Plaintiff has not alleged any facts indicative of an agreement between any of the Defendants. Plaintiff's allegations regarding a conspiracy among the Defendants are entirely conclusory. As such, Plaintiff has failed to state a claim for conspiracy.

**RECOMMENDATION**

It is recommended that all of Plaintiff's claims be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e) and 1915A for failure to state a claim upon which relief may be granted, except for the following claims: (1) Plaintiff's claim regarding his conditions of confinement in the observation cell asserted against Defendants Donnie Bordelon, Jason Linzy, Brandy Landry, and Walter Jarrell; and (2) Plaintiff's retaliation claim regarding the false Rule 21C disciplinary charge, which resulted in his placement in segregation for 73 days, asserted against Defendants Walter Jarrell, Jason Linzy, Brandy Landry, Lt. Col. Kleinpeter, Luke Rheams, Donald Johnson, Jason Russ, Willie Verrett, Stephanie Gaines, Edward Bickham, and Stephen Coody.

It is further recommended that this matter be referred back to the Magistrate Judge for further proceedings herein.

Signed in Baton Rouge, Louisiana, on August 26, 2026.

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**